598 F.2d 1323
 1979-1 Trade Cases 62,577, 4 Fed. R. Evid. Serv. 658
 UNITED STATES of America, Appellee,
v.
John P. FOLEY, Jr., and Jack Foley Realty, Inc., Appellants.
UNITED STATES of America, Appellee,
v.
BOGLEY, INC., Appellant.
UNITED STATES of America, Appellee,
v.
COLQUITT-CARRUTHERS, INC., and John T. Carruthers, Jr., Appellants.
UNITED STATES of America, Appellee,
v.
ROBERT L. GRUEN, INC., Appellant.
UNITED STATES of America, Appellee,
v.
SCHICK & PEPE REALTY, INC., Appellant.
UNITED STATES of America, Appellee,
v.
SHANNON & LUCHS CO., Appellant.
UNITED STATES of America, Appellee,
v.
Robert W. LEBLING, Appellant.
 Nos. 78-5013 to 78-5019.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 5, 1978.
Decided April 19, 1979.
 
 Richard A. Hibey, Washington, D. C. (Robert J. McManus, Surrey, Karaski & Morse, Washington, D. C., William W. Cahill, Jr., Weinberg & Green, Baltimore, Md., on brief), for appellants Colquitt-Carruthers, Inc. and John T. Carruthers, Jr.
 James P. Mercurio, Washington, D. C. (Salvatore A. Romano, Lewis E. Leibowitz, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., on brief), for appellant Shannon & Luchs Co.
 John Henry Lewin, Jr., Baltimore, Md. (James K. Archibald, Venable, Baetjer & Howard, Baltimore, Md., on brief), for appellants Jack Foley Realty, Inc. and John P. Foley, Jr.
 Raymond W. Bergan, Washington, D. C. (Robert P. Watkins, Williams & Connolly, Washington, D. C., E. Austin Carlin, Murphy & Carlin, Bethesda, Md., on brief), for appellants Bogley, Inc. and Robert W. Lebling.
 William O. Bittman, Washington, D. C. (George R. Clark, Pierson, Ball & Dowd, Washington, D. C., on brief), for appellant Robert L. Gruen, Inc.
 Charles N. Shaffer, Peter I. J. Davis, Shaffer & Davis, Rockville, Md., on brief, for appellant Schick & Pepe Realty, Inc.; Catherine G. O'Sullivan, Dept. of Justice, Washington, D. C. (John H. Schenefield, Asst. Atty. Gen., Robert B. Nicholson, Charles S. Stark, Gary L. Halling, Dept. of Justice, Washington, D. C., on brief), for United States of America.
 Before WINTER, Circuit Judge, COWEN*, Senior Judge and PHILLIPS, Circuit Judge.
 PHILLIPS, Circuit Judge:
 
 
 1
 Six corporate and three individual defendants appeal their felony convictions for conspiracy to fix real estate commissions in Montgomery County, Maryland in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Finding no error, we affirm.
 
 
 2
 During the critical period in question all the defendants were realtors engaged as competitors in the business of "reselling" houses. When a person desired to sell his house in Montgomery County he listed it with a realtor, provided he did not decide to attempt to sell it directly. The listing provided that when the house was sold a fixed percentage of the sales price would be paid as a commission to the realtor. This commission was divided among the firms involved in the sale, a portion going to the firm that obtained the listing, another portion to the firm that produced the buyer. To facilitate the operation of this shared commission arrangement, each of the defendants belonged to the Montgomery County Board of Realtors, a trade association that operated a multiple listing service. In the case of almost all houses listed with a member realtor, the member sent a card to the listing service containing a picture of the house and certain pertinent information, including the commission. Thus all member realtors had available a fairly comprehensive list of houses on the market in the county.
 
 
 3
 During the summer of 1974, and for some time before, the prevailing commission rate in Montgomery County was six percent of the sales price. A few houses were listed at seven percent, but additional services were apparently provided for the higher rate. At this time the real estate brokerage business in the county was in difficult straits. While the number of houses listed with brokers for resale had continued to rise as it had for several previous years, the number of sales had fallen, mortgage funds were in short supply and increasing costs of stationery, telephone service, advertising and gasoline had reduced the profit margin.
 
 
 4
 On September 5, 1974, defendant John Foley, the president of defendant Jack Foley Realty, Inc., hosted a dinner party at the Congressional Country Club in Bethesda, Maryland. The guests were nine of the leading realtors in Montgomery County, including each of the three individual defendants and one representative of each of the corporate defendants in this appeal.[1] Following the meal, Foley arose and, after making some other remarks, announced that his firm was raising its commission rate from six percent to seven percent. A discussion about the rate change ensued. Within the following months each of the corporate defendants substantially adopted a seven percent commission rate.
 
 
 5
 A United States grand jury for the district of Maryland indicted the nine defendants on April 1, 1977. Following a number of preliminary motions, the only one of which is of interest to this appeal being the denial of a motion to dismiss for lack of subject matter jurisdiction, a nine day jury trial was held in September 1977 before Judge Stanley Blair. All defendants were found guilty and this appeal ensued.
 
 
 6
 Several issues are presented by the appeals. Part I of the opinion addresses the contention that the district court lacked subject matter jurisdiction because of an insufficient nexus between defendants' conduct and interstate commerce. Part II evaluates the sufficiency of the evidence that a conspiracy was formed and that each defendant participated in it. Part III deals with several objections to the jury instructions. Finally, Part IV discusses a number of evidentiary issues. Additional facts will be developed as pertinent to the several issues.
 
 I. INTERSTATE COMMERCE
 
 7
 The defendants contend that their activities were not proven to be sufficiently related to interstate commerce to support their convictions under 15 U.S.C. § 1. Our review is to determine whether, within applicable principles of law, the evidence was sufficient, when viewed in the light most favorable to the Government, United States v. Sherman, 421 F.2d 198, 199 (4th Cir. 1970) (per curiam), to support the jury's finding on this issue.[2]
 
 
 8
 We start with the applicable legal principles. Jurisdictional reach of the statute is coterminous with Congress' power to regulate interstate commerce. Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 194, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974); United States v. South-Eastern Underwriters Association, 322 U.S. 533, 558 & n.46, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944); Greenville Publishing Co. v. Daily Reflector, Inc., 496 F.2d 391, 395 (4th Cir. 1974). Where conspiracy is charged, it must be shown that it has a sufficient nexus with interstate commerce, but this does not require proof that each charged defendant's activities had the requisite effect. E. g., United States v. Wilshire Oil Co., 427 F.2d 969, 974 (10th Cir. 1970). The existence of a sufficient nexus is to be determined on a practical rather than theoretical basis. E. g., Swift & Co. v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 49 L.Ed. 518 (1905). This means that the determination involves not only raw fact finding but evaluation of the facts by the trier of fact. Accordingly, the results in particular cases are likely to have turned, quite appropriately, on their peculiar facts rather than on legal standards generally applicable to particular categories of business, professional, or trade activities. Thus, the cases that have considered the relationship of particular real estate brokerage activities to commerce are in hopeless disarray so far as their raw results are concerned. See McLain v. Real Estate Board of New Orleans, Inc., 583 F.2d 1315, 1319-20 (5th Cir. 1978), cert. granted,--- U.S. ----, 99 S.Ct. 2159, 60 L.Ed.2d 1043 (1979) (collecting cases). This means that the guiding legal principles must be sought at a more general level than any keyed to the particular nature of the real estate brokerage business, and that detailed efforts to reconcile the disparate results in particular real estate brokerage cases are likely to be bootless.
 
 
 9
 The traditional mode of analysis seeks the requisite nexus along one or both of two general lines of inquiry unrelated in terms to particular categories of commercial activities. One inquires whether the activities alleged to be under illegal restraint lie directly in the flow of interstate commerce; the other, whether though intrastate in nature, they nevertheless have so great an impact on interstate commerce that they substantially affect it. See, e. g., Greenville Publishing Co. v. Daily Reflector, Inc., 496 F.2d at 395 (articulating and discussing the two tests). Obviously these are not bright line, mutually exclusive tests and it is quite possible to analyze a particular pattern of activities without express reliance upon either.[3] Each, after all, strives for answers to the more general question, whether the activities under alleged restraint have a sufficient nexus with interstate commerce. Particular activities may fall within both patterns. Activities directly in the flow of interstate commerce need have but minimal impact upon the commerce to "affect" it, since by definition they are a very part of the stream. See, e. g., Swift & Co. v. United States, 196 U.S. at 398-99, 25 S.Ct. 276. Activities not in the flow of interstate commerce, I. e., intrastate in basic nature, may only be found to affect interstate commerce if their impact upon it is substantial. Compare, e. g., Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948) (substantial), With, e. g., Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940) (unsubstantial). Under either test and in all events , the impact must be upon an identifiable stream of "commerce," and not simply upon a particular business that may be engaged in interstate commerce. See McLain v. Real Estate Board of New Orleans, Inc.,583 F.2d at 1318-19.
 
 
 10
 In Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), on facts closely analogous in many respects to those presented in the instant case, the Supreme Court articulated a test of interstate commerce relationship in which these two traditional tests may be thought to have coalesced, although neither was drawn upon in express terms. Because both sides on this appeal and the district judge in his rulings below perceived as we do the critical relevance of Goldfarb to this case, the test there stated bears emphasis here before the evidence is analyzed. In finding a sufficient nexus between the title search activities of certain Virginia lawyers and an identifiable stream of interstate real estate financing transactions, the Goldfarb Court stated the test simply as "(whether) as a matter of law or practical necessity (the) services (were) an integral part of an interstate transaction." Id. at 785, 95 S.Ct. at 2012. Certain critical aspects of the context in which the lawyers were observing a minimum fee schedule for their services were emphasized by the Court. These were that lending institutions routinely required title insurance as an incident to making mortgage loans in the Virginia county in question; that this in turn required title examinations; that state regulatory authority required that this service be performed only by licensed lawyers; that the lawyers thus favored were observing a minimum fee schedule promulgated by their professional association; and that a considerable volume of the loans involved were funded by out-of-state lending institutions, insured by out-of-state insurance companies, and guaranteed by out-of-state federal agencies. From this combination of factors, the Court concluded that the title examination service for which fixed fees were being charged was "an integral part of an interstate transaction," and that "(g)iven the substantial volume of commerce involved, and the inseparability of this particular legal service from the interstate aspects of real estate transactions . . . interstate commerce has been substantially affected. Id. at 785, 95 S.Ct. at 2012 (footnote omitted).
 
 
 11
 In this case, as in Goldfarb, the evidence was quite sufficient to permit the trier of fact to determine that the activities in question, here those of real estate brokers, were as a matter of practical necessity an integral part of an identifiable stream of interstate real estate transactions. The charged conspirators here were shown to be engaged in a business that consisted essentially of bringing together prospective buyers and sellers of residences in Montgomery County, Maryland, and then facilitating in various ways the consummation of resulting sale-purchase agreements between sellers and buyers. Montgomery County is a suburban area contiguous to the District of Columbia, and the brokers in question consciously and understandably capitalized upon the highly transient nature of this particular real estate market. A quite considerable volume of the total of brokered sales in which they participated involved purchasers coming into the state and sellers leaving the state.[4] Extensive advertising of the brokerage services was placed by various ones of the defendants in out-of-state media, including military and civil service personnel journals.[5] Some of the brokers participated in national "relocation" services[6] and extensively used interstate channels of communications[7] in developing and servicing the out-of-state clientele. A considerable amount of the financing for brokered purchases came from out-of-state lending institutions and substantial numbers of the purchase loan mortgages were guaranteed by federal agencies headquartered in the District of Columbia.[8] While the charged brokers did not participate directly in the interstate lending and loan guarantee transactions incident to their brokered sales, they clearly held out as part of their brokerage services their ability to facilitate these.[9] The overall picture that emerges is one of a substantial stream of interstate commerce in which these brokers' activities were not only an "integral part," but in practical effect the dominant factor in first creating a substantial interstate market by utilizing interstate advertising and referral services, and then drawing in interstate funding and loan guarantees for the resulting purchase money mortgages. While there are of course differences between the lawyers' activities in Goldfarb and the brokers' in the instant case, most suggest a more, not less, substantial impact on interstate commerce for the brokers' activities than for the lawyers'. Defendants emphasize that the brokers' services here were not undergirded by legal compulsion as were those of the lawyers in Goldfarb. While that is true, the practical necessity for utilizing a local broker's services, particularly for out-of-state purchasers and sellers, was substantially equal on the evidence presented, hence quite as integral and "inseparable" a part in the final analysis. And on the other hand, while the lawyers in Goldfarb took no specific part in creating the critical interstate market of specific buyers and sellers necessary to generate their fees, the brokers in the instant case played a dominant part in creating the specific interstate market that ultimately provided their commissions.
 
 
 12
 The impact of the charged restraint on the brokerage services demonstrably had a substantial effect on interstate commerce. Since the conspiracy as charged raised the price of the critical service of bringing together the home sellers and buyers, this affected the need for financing "as a matter of practical economics." Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 745, 96 S.Ct. 1848, 1852, 48 L.Ed.2d 338 (1976); See id. at 744-47, 96 S.Ct. 1848. Similarly, increased prices resulting from increased brokerage commissions must, as a matter of practical economics, confront every purchaser wishing to buy a Montgomery County residence. Therefore, as in Goldfarb, the numerous out-of-state purchasers of these residences could not as a practical matter escape the effect of these commissions.
 
 
 13
 Whether analyzed as being in the flow of interstate commerce, as local but substantially affecting interstate commerce, or as being by practical necessity an "integral part" of identifiable interstate transactions, the evidence here adequately supported the jury's finding of a sufficient nexus between the brokers' activities and interstate commerce, and of a substantial effect of the restraint charged upon that commerce.
 
 II. CONSPIRACY AND PARTICIPATION
 
 14
 Defendants next contend that there was insufficient evidence, although considered in the light most favorable to the government, to allow a jury to find the existence of a conspiracy and the participation of each defendant in it beyond a reasonable doubt. Their related contention that guilt beyond a reasonable doubt can only exist if all other reasonable hypotheses are negated has been rejected. United States v. Bobo, 477 F.2d 974, 989 (4th Cir. 1973). A final suggestion that our review on this point should be more stringent because this is a felony, rather than a misdemeanor, prosecution is also without merit. Neither the classification of the offense nor the extent of the possible punishment in any way affects the question whether there was sufficient evidence of each element of an offense. Our review of the evidence leads to the conclusion that under applicable standards of review the evidence was sufficient to sustain the jury findings on these issues.
 
 A. The Evidence of Conspiracy
 
 15
 Proof of a § 1 conspiracy need not be direct. "Acceptance by competitors of an invitation to participate in a plan, the necessary consequence of which, if carried out, is a restraint of commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act, where each competitor knew that cooperation was essential to successful operation of the plan." 3 P. Areeda & D. Turner, Antitrust Law: An Analysis of Antitrust Principles and Their Application P 841a, at 361-62 (1978). While such evidence does not compel a finding of conspiracy, Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954), it does permit such a finding, Interstate Circuit, Inc. v. United States,306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); Esco Corp. v. United States, 340 F.2d 1000, 1007 (9th Cir. 1965). Within this principle, we find ample evidence to permit the finding of a conspiracy involving each of the defendants.
 
 
 16
 In the months preceding the September 5 dinner, several of the defendants were contemplating a change in commission rate, but were concededly afraid to undertake such a move for fear that they would be unable successfully to compete with firms still at six percent. Schick & Pepe had previously attempted to go to a seven percent rate and had failed because of competition. It was in this general climate of concern about competitive constraints that Foley called the meeting of September 5. At the dinner Foley rose, made some prefatory remarks and then stated that his firm was in dire financial condition. Saying that he did not care what the others did, he then announced that his firm was changing its commission rate from six percent to seven percent. Testimony as to what was said by various persons in the ensuing discussion is greatly in conflict, but there was evidence from which the jury could find that each of the individual defendants and a representative of each corporate defendant not represented by one of the individual defendants expressed an intention or gave the impression that his firm would adopt a similar change. The discussion also included reference to the earlier unsuccessful effort by Schick & Pepe to adopt a seven percent policy, from which the jury could conclude that defendants knew that their cooperation was essential. Evidence presented in the form of detailed charts with explanation by an economist qualified as expert witness showed that in the months following each defendant did in fact begin to take substantial numbers of seven percent listings. Moreover, the jury heard testimony of a number of instances in which members of the conspiracy sought after the September 5 dinner to hold their fellows to the "agreement." Details of these events will be developed more fully in the following discussion of the connection of each defendant to the conspiracy.
 
 
 17
 B. Connection of Each Defendant to the Conspiracy
 
 
 18
 (1) Jack Foley Realty, Inc. and John P. Foley, Jr.
 
 
 19
 Jack Foley hosted the September 5 dinner, inviting in addition to a few realtors who were close personal friends, those he regarded as the most active members of his profession. He had previously announced the commission change to his staff and on September 15 mailed a notice concerning it to all local realtors. By early October, Foley, Inc. had thirty percent of its listings at the higher rate; by December, the figure was in excess of seventy percent and remained in that neighborhood throughout 1975.
 
 
 20
 Allyn Rickman, vice president of Schick & Pepe and a guest at the September 5 dinner, testified that after Schick & Pepe took some six percent listings, Foley called him and told him that was a "mistake" because if they all did not hold the line none of them could get seven percent.
 
 
 21
 Before the policy change, Foley's firm had accepted a house at a six percent listing. When the listing was renewed after the policy change, still at six percent, Foley, Inc. sent a card to the listing service which was in turn distributed to all the local realtors. A listing card was then received anonymously in the mail by Foley with a question mark on it. When the house was again relisted, the contract and the listing with the service were both at seven percent. John O'Keefe, a vice president at Foley, Inc., however, wrote a letter to the homeowner/seller informing him that Foley would reimburse him for the extra one percent.[10] The letter contained the following explanation:
 
 
 22
 "The reason I don't want (the listing) to go through showing 6% Is our Firm was one of the leading Firms in changing from 6% To 7% And with Mr. Foley being the President of the Board of Realtors, I just don't want any unjust criticism of him or our Company for taking your listing at less than 7%."
 
 
 23
 (2) Colquitt-Carruthers, Inc. and John T. Carruthers, Jr.
 
 
 24
 John T. Carruthers of Colquitt-Carruthers, Inc. attended the dinner. The testimony conflicts on whether he said he was already at seven percent, or whether he was going to go to seven percent. His accountant testified that a policy change occurred between September 10 and September 24. Effective September 24, all listings other than at seven percent had to be accompanied by explanation; after November 1, they would not be accepted at less than seven percent. By October 1974, Colquitt-Carruthers had sixty percent of its listings at the new rate and through the end of 1975 the figure was generally in excess of eighty percent.
 
 
 25
 There was testimony that Carruthers made several attempts to ensure the cooperation of other firms. William Ellis, vice president of Shannon & Luchs Co., a firm that delayed implementation of the seven percent policy, testified that Carruthers called him on three occasions. Around January 1, 1975, Carruthers called and asked about Ellis' "considerations." Ellis replied "You know I can't make the decision." Carruthers then offered to call the man who could make the decision. Later in January, Carruthers again called, this time explicitly asking about the change. Upon being told that Shannon & Luchs had adopted a seven percent policy, but had set no date for its implementation, Carruthers "threatened" Ellis with the loss of his job. In April when Shannon & Luchs' Gaithersburg, Maryland office took some six percent listings, Carruthers again called Ellis to complain.
 
 
 26
 Allyn Rickman, vice president of Schick & Pepe Realty, Inc., also testified that Carruthers called him to complain about some six percent listings that Schick & Pepe had accepted.[11] He quoted Carruthers as saying "if we do not stay at seven percent, then it would be a slide back and . . . no one could get seven percent, because the competition would hurt us." There was also testimony that Carruthers complained to Robert Dorsey, a vice president at Bogley, Inc., about that firm having taken more six than seven percent listings.
 
 
 27
 (3) Bogley, Inc. and Robert W. Lebling
 
 
 28
 Robert Lebling, the president and seventy percent owner of Bogley, Inc., attended the September 5 dinner. The testimony is in conflict whether he said he would go to a seven percent rate, or that he would do so if it were to his advantage. On September 27, Bogley, Inc. adopted a policy of seeking seven percent but not losing any listings over the attempt. At least one version of the meeting at which that decision was made places the initiative for the proposal with Lebling. Bogley, Inc. had no seven percent listings from June through September 1974, but nearly fifty percent of the listings in October and November 1974 were at the higher rate and in December seventy percent were at the new rate. The percentage of seven percent listings fluctuated between forty and sixty-five percent until April, then settled at around thirty percent. Since the agreement itself, not its performance, is the crime of conspiracy, United States v. Trenton Potteries Co., 273 U.S. 392, 402, 47 S.Ct. 377, 71 L.Ed. 700 (1927); Plymouth Dealers' Association v. United States, 279 F.2d 128, 132 (9th Cir. 1960), the partial non-performance of Bogley does not preclude a finding that it joined the conspiracy.
 
 
 29
 (4) Schick & Pepe Realty, Inc.
 
 
 30
 Allyn Rickman, vice president of Schick & Pepe Realty, attended the dinner. He testified that he stated at that time that his firm would adopt a seven percent policy. On October 4, 1975, it did adopt such a policy and by November had well over eighty percent of its listings at the higher rate. Rickman testified that but for the dinner the firm would not have changed its policy. In August, the firm had considered such a change, but decided against it because of fear that it would be unable to compete for listings. There was also evidence that Rickman complained to Robert Dorsey, vice president of Bogley, Inc., about Bogley's failure to take only seven percent listings.
 
 
 31
 (5) Shannon & Luchs Co.
 
 
 32
 Shannon & Luchs did not officially adopt a seven percent policy until January 1975. At the dinner, its vice president, William Ellis, stated that they should not be discussing a rate increase and said that his firm was always the first to be investigated when something like this happened as it was the county's largest. He also stated that Shannon & Luchs would probably go to seven percent at a later date; Allyn Rickman remembered a possible mention of the first of the year. On September 9, Ellis told his managers not to turn down any seven percent listings they had an opportunity to get. In fact, the percentage of seven percent listings taken by Shannon & Luchs crept toward thirty percent by January 1975. Early in January, John T. Carruthers called Ellis and asked about his "considerations." Ellis told him that he, Ellis, did not make those decisions and Carruthers then offered to telephone the man who did; Ellis replied that he did not need help. On January 15, at Ellis' suggestion, Shannon & Luchs adopted a policy of taking seven percent listings unless some other rate were beneficial to the firm or otherwise appropriate. Although the new policy was not implemented until March 1, by that time forty percent of Shannon & Luchs' listings were at seven percent. By early April, the figure was about sixty-five percent and throughout 1975 it stood between eighty and ninety. In response to a comment from Carruthers in April, Ellis acknowledged that he had a "problem" in his Gaithersburg, Maryland office in implementing the policy. Shannon & Luchs did not adopt a seven percent policy for its offices in northern Virginia because of the threat of competition.
 
 
 33
 (6) Robert L. Gruen, Inc.
 
 
 34
 Robert Gruen attended the Congressional Country Club dinner. While Allyn Rickman's testimony is in conflict as to Gruen's statements at that dinner, on more than one occasion he testified that Gruen said he was going to go to seven percent. Louise Lewis, a Gruen sales agent, testified that the Gruen policy as early as June 1974 was at least to seek seven percent listings, but acknowledged that she sought no seven percent listings before September.
 
 
 35
 Gruen had one listing at seven percent out of a total of seven in August 1974 and none in September, but took three of eleven at the higher rate in October. By early 1975, the firm consistently had eighty percent or more of its listings at seven percent.
 
 
 36
 Gruen makes much of the fact that it had seven listings at seven percent from March to August 1974 and also had seven such listings from September to December. Put in percentages, however, that apparent continuity evaporates: the March to August figure represents only ten percent of Gruen's listings; there were no seven percent listings in September; and from October to December, Gruen had thirty-five percent at a seven percent commission. These figures are sufficient to allow the jury, in connection with Rickman's testimony, to conclude that Gruen also adopted a higher commission rate following the September 5 dinner and that that adoption was part of the alleged conspiracy.
 
 C. Conclusion
 
 37
 We conclude that this evidence, here merely summarized and highlighted from a much more detailed body of proof adduced by the Government, was sufficient to permit the jury to find as it did against each of the defendants on the conspiracy issue. Defendants of course offered explanatory and exculpatory evidence, and on this appeal urge that the proper inferences to be drawn from all the evidence relieve their actions of criminal implications. Among these arguments is the interesting one that only by graceless refusals to accept Foley's invitation to dinner or by equally graceless withdrawals from it once its purpose was revealed could they have avoided the factual inferences required to implicate them in the conspiracy, and that to sustain their convictions will impose intolerable burdens on businessmen confronted with like dilemmas. This, with other arguments about the proper inferences to be drawn from the evidence, was undoubtedly presented to the jury by able counsel for the defendants. A properly composed jury of defendants' peers rejected this factual argument as well as others in reaching its verdict of guilty. That to sustain the jury finding on this issue may have the inhibitory effect on the conduct of others that is urged by defendants does not speak to the force of the evidence supporting the jury's finding in this case.
 
 III. JURY INSTRUCTION
 
 38
 Defendants complain that the court failed to instruct the jury that it had to find that defendants acted with specific intent before it could find them guilty beyond a reasonable doubt. While this contention is none too plainly developed, it apparently comes to the suggestion that to be convicted of a felony violation of § 1 they had to conspire with the specific intent to accomplish a restraint of trade.[12]
 
 
 39
 Section 1 had traditionally been interpreted to define a strict liability offense, E. g., United States v. Patten, 226 U.S. 525, 543, 33 S.Ct. 141, 57 L.Ed. 333 (1913), until in June 1978, the Supreme Court held that a criminal conspiracy prosecution under § 1 must include proof that the defendants acted with knowledge that their conduct would affect prices. United States v. United States Gypsum Co., 438 U.S. 422, 98 S.Ct. 2864, 2877, 57 L.Ed.2d 854 (1978). Gypsum involved a misdemeanor case, the indictment having been brought prior to the effective date of the 1974 amendment making § 1 a felony provision. From this, defendants contend that the scienter requirement imposed in Gypsum is not necessarily as stringent as that required for the now felony offense.[13]
 
 
 40
 While certain conduct may not be made criminal without including as an element of the offense a certain degree of scienter, we do not believe the 1974 amendment of the Sherman Act, Antitrust Procedures and Penalties Act, Pub.L. No. 93-528, § 3, 88 Stat. 1706, 1708 (1974), mandates that specific intent in the sense apparently suggested by defendants be made an element of a § 1 conspiracy. Although in most cases particular scienter requirements seem to be based simply on statutory construction, See Morrissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), there are undoubtedly due process restrictions on the legislature's power to define certain conduct as criminal absent particular scienter requirements. E. g., Lambert v. California, 355 U.S. 225, 228, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957); Holdridge v. United States, 282 F.2d 302 (8th Cir. 1960) (Blackmun, J.). We think neither the amended statute nor the Constitution require the specific intent apparently contended for by defendants here.
 
 
 41
 In increasing the penalties for violating § 1 and redefining the offense as a felony, Congress did not intend to change the elements of the offense. E. g., 120 Cong.Rec. 36,340 (1974); See United States v. Continental Group, Inc., 456 F.Supp. 704, 717 (E.D.Pa.1978); United States v. Noll Manufacturing Co., 1977-2 Trade Cas. P 61,712 (N.D.Cal.1977). Hence, we consider the Gypsum rule, so far as statutory interpretation is concerned, still to apply to § 1 offenses.
 
 
 42
 Neither do we find merit in the argument that constitutional considerations require proof of "specific intent" in the sense urged by defendants. While intent of the specificity apparently urged by defendants may be constitutionally mandated with respect to offenses impinging highly protected realms of conduct such as speech, See Smith v. California, 361 U.S. 147, 154, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) (reserving question), in the area of commercial regulation due process does not require more at the outside than that a defendant shall have acted with knowledge of the anticipated consequences of his action. United States v. United States Gypsum Co., 98 S.Ct. at 2878.
 
 
 43
 We thus find no error in Judge Blair's instructions in which he told the jury in substance that it must find beyond a reasonable doubt that defendants must have known that their agreement, if effectuated, would have an effect on prices; that they knowingly joined a conspiracy whose purpose was to fix prices; and that in joining they intended to further that purpose.
 
 
 44
 Defendant Shannon & Luchs also complains of the following instruction, asserting that it required too little connection with the conspiracy:
 
 
 45
 (The requirement that the evidence show beyond a reasonable doubt that the Defendants knowingly participated in the unlawful plan with the intent to further or advance some object or purpose of the conspiracy) is satisfied if the evidence shows beyond a reasonable doubt a knowing assistance of any kind in effectuating the objective of the conspiracy.
 
 
 46
 Without deciding whether this particular portion of the charge required too little connection, we conclude that the charge as a whole did require a sufficient involvement by each defendant. For example, within paragraphs of the allegedly deficient instruction, the following was charged:
 
 
 47
 A Defendant may be found guilty of a conspiracy only if the Defendant understood that he had joined the single overall conspiracy that is charged. If any Defendant was not a party to that overall agreement or conspiracy, you must find that Defendant not guilty even if he participated in isolated or subsidiary actions or events which aided the ends of the conspiracy.
 
 
 48
 Robert Lebling, Bogley, Inc., John T. Carruthers and Colquitt-Carruthers, Inc. complain that the court failed to instruct that proof of good character Alone can create reasonable doubt. Judge Blair gave substantially the charge requested, but refused to include the word "alone." Defendants rely on Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), for the proposition that this refusal was error.
 
 
 49
 Michelson, an opinion dealing with the admissibility of character evidence, does include dictum that in a proper case a defendant who puts on substantial evidence of good character is entitled to an instruction that such evidence alone may create reasonable doubt, Id. at 476, 69 S.Ct. 213, but the Circuits have split on whether such an instruction must be given. Two circuits hold that the word "alone" must be included. United States v. Lewis, 157 U.S.App.D.C. 43, 482 F.2d 632, 637 (1973); United States v. Donnelly, 179 F.2d 227, 233 (7th Cir. 1950). The Tenth Circuit holds that "alone" must be included if good character is the only defense raised and perhaps in other circumstances, Oertle v. United States, 370 F.2d 719, 726-27 (10th Cir. 1966), but does not require it in all cases, Swingle v. United States, 389 F.2d 220, 222 (10th Cir. 1968); See United States v. Tijerina, 407 F.2d 349, 356 (10th Cir. 1969) (semble). The other circuits do not require that the word be included in the charge, at least where good character is not the only defense. United States v. Fontenot, 483 F.2d 315, 323 (5th Cir. 1973); United States v. Lachmann, 469 F.2d 1043, 1046 & n. 3 (1st Cir. 1972); United States v. Fayette, 388 F.2d 728, 737 (2d Cir. 1968); United States v. Brown, 353 F.2d 938, 939-40 (6th Cir. 1965); Carbo v. United States, 314 F.2d 718, 746-47 (9th Cir. 1963); Black v. United States, 309 F.2d 331, 343-44 (8th Cir. 1962); See United States v. Klass, 166 F.2d 373, 378-80 (3d Cir. 1948). In 1944 this Circuit held that the word "alone" need not be included in a charge. Mannix v. United States, 140 F.2d 250, 253-54 (4th Cir. 1944).
 
 
 50
 In Michelson, the Supreme Court relied on the case of Edgington v. United States, 164 U.S. 361, 366, 17 S.Ct. 72, 41 L.Ed. 467 (1896). That case disapproved an instruction to the effect that character evidence should be considered only if the other evidence created doubt. It did not hold that character evidence is so highly probative that it must always be singled out as potentially exculpatory standing "alone." Carbo v. United States, 314 F.2d at 746. We believe the better view, which we think not foreclosed by Michelson, continues to be that expressed by this court in Mannix and followed by a majority of the circuits. We need not hold that an "alone" instruction could in no circumstances be a matter of right to find it not required in this case. Here defendants did not rely on character evidence alone for their defense. The instructions properly allowed the jury to consider it along with other evidence, and clearly did not suggest that the jury might not find in the character evidence "alone" a basis for reasonable doubt.
 
 IV. EVIDENTIARY ISSUES
 
 51
 Defendants John Foley and Jack Foley Realty, Inc. assert that the district court erred in admitting into evidence a letter written from a Foley vice president, John O'Keefe, to a homeowner whose house had been relisted at seven percent.[14]
 
 
 52
 During the grand jury investigation some of the records of Foley, Inc. were subpoenaed. While this letter was covered by the subpoena it was not produced. Shortly before trial, an attorney in a civil suit involving the same conspiracy called the United States Attorney and told him about the letter. The government asked the attorney for a copy of the letter, but since it was subject to a protective order in the civil suit, the attorney asked that the government obtain the letter directly from defendants. The letter was then so obtained. In ruling on the objection to the admission of the letter, Judge Blair assumed that it had been obtained in violation of the protective order. We make the same assumption.
 
 
 53
 The government is not precluded from introducing improperly obtained evidence so long as it did not participate in the impropriety. Burdeau v. McDowell, 256 U.S. 465, 476, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); United States v. Francoeur, 547 F.2d 891, 893 (5th Cir. 1977).[15] Judge Blair found that the government had not participated in the assumed violation of the protective order; that finding is not clearly erroneous.
 
 
 54
 Defendants seek to analogize the protective order to 47 U.S.C. § 605, a provision of the Federal Communications Act which they assert has been interpreted to prohibit the admission of communications seized in violation of its terms even absent government complicity. Assuming that defendants' construction were correct, a proposition which we do not accept save for the purposes of argument, See Bubis v. United States, 384 F.2d 643 (9th Cir. 1967) (allowing admission of communication seized in violation of § 605), we reject the analogy. Section 605 was obviously intended to further broader policies than is a protective order of the type here involved. No suggestion is made that the government has engaged in impermissible discovery, that defendants' privilege against self-incrimination has been violated[16] or that the admission of the letter occasioned prejudicial publicity. The letter was subject to a subpoena and should have been produced during the grand jury investigation. To allow its admission in a situation where the government did not act improperly would not frustrate any valid policy.
 
 
 55
 Defendants object to the admission of a series of charts, designated Government Exhibits Numbers 39 through 51. Numbers 39 through 50 summarized the number of listings filed by each realtor with the multiple listing service and portrayed the percentage of those listings which were at the higher, seven percent commission rate. These charts were compiled by a Justice Department economist from data obtained from the multiple listing service. Defendants were apprised that the government intended to use a compilation of such data well before trial and the documents were available for inspection at the Justice Department throughout May and June 1977. Defendants complain, however, that the charts themselves were not made available until the weekend before trial.
 
 
 56
 Fed.R.Evid. 1006 provides: "The contents of voluminous writings . . . which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place." The data upon which these charts were based came from defendants' own listing service, the documents were made available to defendants at the Justice Department well before trial and the charts themselves were provided the weekend before trial. Defendants complain that the charts should have been made available longer in advance of trial, relying on the last sentence of Rule 1006. That sentence refers to making available the original documents, not the charts themselves. 5 J. Weinstein & M. Berger, Weinstein's Evidence P 1006(04), at 1006-8 (1975). The charts themselves are not misleading and we cannot say Judge Blair abused his discretion in allowing their admission.
 
 
 57
 Government Exhibit No. 51 summarized the percentage of houses sold by each defendant that were purchased with loans guaranteed by the Veterans Administration or the Federal Housing Administration. Defendant Foley and his firm complain that the base data for this chart was never made available to them. The chart was compiled from data contained in machine-readable "diskettes" provided by the multiple listing service. The diskettes were not made available to defendants, but a computer print-out of the information they contained was and the diskettes themselves only contained data that was provided to defendants themselves by their multiple listing service in the normal course of business. The computer print-outs qualify as duplicates of the diskettes within the meaning of Rule 1006. Fed.R.Evid. 1001(4). In any event, defendants conceded that substantial out-of-state funds were used to purchase houses they brokered. Thus, the admission of the chart, if erroneous, would seem to be harmless error.
 
 
 58
 Father Henry O'Meara testified to a number of versions of a conversation he had with John T. Carruthers concerning Robert Lebling's reluctance to take seven percent listings. Carruthers and Colquitt-Carruthers, Inc. contend that the trial court erred in failing to strike the testimony, apparently on the ground that the potential for confusion, due to the inconsistencies in the several versions as to what actually was said, outweighed any relevance the testimony had. The decision to strike testimony on grounds of lack of relevance is committed to the district judge. We cannot say he abused that discretion in this instance.
 
 
 59
 The same two defendants also object to the trial court's allowing Allyn Rickman to refresh his recollection concerning a conversation he had with Carruthers with a transcript of his previous grand jury testimony.[17] We cannot say that Judge Blair abused his discretion in concluding that Rickman's memory was exhausted, that the grand jury transcript would be helpful in refreshing it or that it was in fact refreshed.
 
 
 60
 Finally, Robert L. Gruen, Inc. complains that the government interfered with its cross-examination of Rickman by withholding discoverable information. Gruen was provided with the information that Rickman had told the government that he could not recall Robert Gruen saying at the dinner that his firm would go to seven percent. Gruen was not given the notes taken by a government attorney of the interview nor was it told that Rickman had said that he had the Impression from the dinner that Gruen would go to seven percent. When Rickman testified that Gruen had said his firm would go to seven percent, Gruen attempted to impeach him with the prior inconsistent statement. Rickman stated that he could not recall having made the statement to the government. Gruen then sought production of the interview notes, but the government refused to allow the statement that Rickman could not recall Gruen saying he would go to seven percent to be used unless the statement that Rickman had the impression Gruen would go to seven percent was also admitted. In the end, the jury was apprised of both statements.
 
 
 61
 The interview notes were not verbatim nor had they been approved by Rickman. Thus they were not discoverable under the Jencks Act, 18 U.S.C. § 3500. Without reaching the question whether the failure to make a full disclosure of Rickman's statements violated the principle of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), we conclude that under the circumstances any error in this regard was harmless beyond a reasonable doubt. In the trial court's final working out of the awkwardness, the jury was apprised of the possibility that Rickman had given different versions of his recollection on the critical point. The essential impeachment purpose was thus served, and defendant's hurt is thus reduced essentially to tactical discomfiture of limited duration and impact. While even this could have been avoided by a more fully forthcoming disclosure by the Government, we cannot find in it error requiring reversal of these convictions.
 
 
 62
 Having carefully considered the record, the briefs and the oral arguments of all the parties we conclude that no reversible error has been made in the trial of this difficult and complicated case. The convictions of the nine defendants therefore are affirmed.
 
 
 63
 AFFIRMED.
 
 
 
 *
 Honorable Wilson Cowen, Senior Judge, United States Court of Claims, sitting by designation
 
 
 [1]
 Defendant Colquitt-Carruthers, Inc. was represented by defendant John T. Carruthers, Jr.; defendant, Shannon & Luchs Co. was represented by William Ellis; defendant Schick & Pepe Realty, Inc. was represented by Allyn Rickman; defendant Bogley, Inc. was represented by defendant Robert W. Lebling; and defendant Robert L. Gruen, Inc. was represented by Robert L. Gruen
 
 
 [2]
 A sufficient relationship to interstate commerce is both a critical jurisdictional fact and an element of the substantive offense charged under 15 U.S.C. § 1. Facts sufficient for the one are sufficient for the other, and vice versa. Existence of the jurisdictional fact may be attacked independently, or in conjunction with the defense on the merits. Cf. McLain v. Real Estate Board of New Orleans, Inc., 583 F.2d 1315, 1323-24 (5th Cir. 1978), cert. granted, --- U.S. ----, 99 S.Ct. 2159, 60 L.Ed.2d 1043 (discussing comparable procedures in civil actions). In this case, all the defendants but Schick & Pepe Realty, Inc. made a jurisdictional attack by pre-trial motion to dismiss the indictments under Fed.R.Crim.P. 12. The district court denied this motion, assessing the facts as charged in the indictments. When the case then proceeded to trial, the substantive interstate commerce issue was submitted to the jury and found against the defendants. Defendants' attack is therefore upon the jury's finding on this issue as it was necessarily subsumed within the general verdict of guilty. No challenge having been made to the district court's instruction on the issue, we assume its correctness. The only remaining basis for challenge is therefore to the sufficiency of the evidence to support the implicit jury finding on this issue, and it is this we review. Because there is no suggestion of variance between indictment and proof, review of the sufficiency of the evidence on the substantive issue necessarily reviews the sufficiency of the facts as found to support the court's jurisdiction. The jury's findings on the evidence thus in effect supersede the district court's jurisdictional finding on raw factual averments in the indictments
 
 
 [3]
 It may be questioned whether, in any event, these two "tests" will withstand logical scrutiny as discretely different frameworks for close legal analysis. Courts quite frequently conduct searching interstate commerce relationship analyses without express reliance upon them. See, e. g., Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). Significantly on the point, while both sides and the district judge in this case assumed that Goldfarb was a "local but affecting" case, a distinguished constitutional scholar in a recent analysis assumed without elaboration that it was an "in-commerce" type. Strong, Court vs. Constitution: Disparate Distortions of the Indirect Limitations in the American Constitutional Framework, 54 N.C.L.Rev. 125, 137-40 (1976)
 
 
 [4]
 Distinguishing this case factually from those wherein real estate brokerage activities were not shown to have involved any considerable volume of out-of-state buyers and sellers. E. g., Diversified Brokerage Services, Inc. v. Greater Des Moines Board of Realtors, 521 F.2d 1343, 1346 (8th Cir. 1975). While it may generally be correct to say that "the mere movement of individuals from one state to another in order to utilize particular services does not transform those services into interstate services within the meaning of the Sherman Act," Id., that hardly describes the factual situation presented here. A more apposite principle for the facts of this case is the congressional determination upheld in Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1969), that even "local" businesses that provide services to substantial numbers of persons traveling across state lines may affect interstate commerce. Here, as the analysis in the body of our opinion shows, there was much more of an interstate character to defendants' activities than merely awaiting passively the chance descent of out-of-state customers and then providing these with purely "local" services
 
 
 [5]
 This included advertising in Washington, D.C., newspapers and radio stations (App. 111, 998, 1003), the Foreign Service Journal, and the Army, Navy, Air Force Times (App. 1020-21). At least one defendant advertised its use of a "Military Transfer Department" and a "Corporate Referral Department" which enabled it to identify potential buyers and sellers among military and business transferees (App. 1042-43); offered to military personnel a "Free Relocation Kit" (App. 187-88); and invited collect telephone calls from prospective home purchasers coming into the Washington, D.C., area (App. 1039)
 
 
 [6]
 Incident to which they paid commissions directly to out-of-state brokers who found purchasers for their listings, and received commissions directly from out-of-state brokers to whom they referred clients. (App. 998-99, 1004, 1014, 1020)
 
 
 [7]
 See American Power & Light Co. v. SEC, 329 U.S. 90, 98-99, 67 S.Ct. 133, 91 L.Ed. 103 (1946); North Am. Co. v. SEC, 327 U.S. 686, 694-95, 66 S.Ct. 785, 90 L.Ed. 945 (1946)
 
 
 [8]
 App. 970-95, 997-99, 1003-04, 1019-23, 1062
 
 
 [9]
 One advertised that potential purchasers should consult a broker because he could "guide you in getting a loan," and will "be able to negotiate the best available financing." (App. 1046)
 
 
 [10]
 Foley and Foley, Inc. object to the admissibility of that letter. See Part IV Infra
 
 
 [11]
 Carruthers and Colquitt-Carruthers contend this testimony should not have been allowed. See Part IV Infra where we conclude that there was no error in its admission
 
 
 [12]
 Some defendants may contend for an even more specific intent: to denigrate or mock the law in the sense apparently of intending specifically to violate the Sherman Act. Because we find even the less stringent requirement without support, we do not address this one
 
 
 [13]
 Gypsum also involved a rule of reason offense rather than a per se violation of § 1 such as the price fixing here alleged. While the Court's analysis is in part dependent on the relative lack of notice provided by rule of reason offenses, the rule announced is framed in terms of all § 1 criminal prosecutions
 
 
 [14]
 See text accompanying note 4 Supra
 
 
 [15]
 This rule has developed in cases involving alleged constitutional improprieties so it may be said to be predicated on a lack of state action. On the other hand, the notion that the mere fact of impropriety should preclude admissibility has not been accepted. See Burdeau v. McDowell, 256 U.S. at 476-77, 41 S.Ct. 574 (Brandeis, J., dissenting). If impropriety of a constitutional dimension does not preclude admissibility absent Government complicity, a more stringent rule in a non-constitutional setting would be inappropriate
 
 
 [16]
 The letter was neither the personal property of nor in the possession of Mr. Foley; Foley, Inc. has no privilege against self incrimination. United States v. White, 322 U.S. 694, 698-99, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944)
 
 
 [17]
 See text accompanying note 5 Supra