**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 05-5266

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MARCUS D. DUKES,

Defendant - Appellant.

Appeal from the United States District Court for the District of
Maryland, at Greenbelt. Roger W. Titus, District Judge. (CR-03-
133)

Argued: March 13, 2007                    Decided: July 3, 2007

Before WILLIAMS, Chief Judge, MOTZ, Circuit Judge, and HAMILTON,
Senior Circuit Judge.

Affirmed in part, vacated in part, and remanded by unpublished
opinion. Chief Judge Williams wrote the majority opinion, in which
Judge Motz concurred. Senior Judge Hamilton wrote a separate
dissenting opinion

**ARGUED:** Sherri Lee Keene, OFFICE OF THE FEDERAL PUBLIC DEFENDER,
Greenbelt, Maryland, for Appellant. Bryan Edwin Foreman, Assistant
United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY,
Greenbelt, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal
Public Defender, Daniel W. Stiller, Assistant Federal Public
Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt,
Maryland, for Appellant. Rod J. Rosenstein, United States
Attorney, Baltimore, Maryland, Steven M. Dunne, Assistant United

States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

WILLIAMS, Chief Judge:

A jury convicted Marcus Dukes of mail fraud, 18 U.S.C.A. § 1341 (West 2000 & Supp. 2006); interstate transportation of property obtained by fraud, 18 U.S.C.A. § 2314 (West 2000 & Supp. 2006); and money laundering, 18 U.S.C.A. § 1957(a) (West 2000 & Supp. 2006). These convictions relate to Dukes's leadership in a fraudulent investment scheme that targeted the African-American church community. Dukes appeals his convictions on numerous evidentiary grounds and, alternatively, contends that the district court erred in applying certain U.S. Sentencing Guidelines enhancements to his sentence. We affirm Dukes's convictions, finding no reversible error. We nevertheless vacate Dukes's sentence and remand for resentencing because we conclude that the district court erred in applying the guideline enhancement for "aggravating role" to Dukes's sentence.

I.

A.

In 2000, Dukes and his business partner, Teresa Hodge, founded Financial Warfare Club (FWC), a Maryland nonprofit corporation.[1] They marketed FWC as a "synergistic financial network created specifically for the body of Christ." (J.A. at 500.)[2] Dukes and

---

[1]FWC listed its principal office as 12138 Central Avenue, Suite 233, Mitchellville, Maryland, 20721, which was the address for a mailbox at a Mailboxes, Etc. location.

[2]Citations to the "J.A." refer to the Joint Appendix filed with this appeal.

3

Hodge, who are both African-American, claimed that FWC was created to generate wealth within the African-American community by promoting investment literacy among those who typically lacked knowledge of financial markets and by providing investment opportunities in companies that would purportedly generate revenue that would stay within the African-American community.

To that end, Dukes and Hodge primarily sought to grow FWC through presentations to African-American clergy and church groups. Invitations to FWC presentations were typically distributed during church services, and the pastor of the hosting church would usually introduce Dukes and Hodge to the attendees. Dukes littered FWC presentations with biblical references, often underscoring FWC's purported goal of community financial empowerment by referencing the biblical passage Hosea 4:6, which states, "My people are destroyed for a lack of knowledge."

FWC offered three membership levels. The top level, known as the "Founders Level," required an initial payment of $2,550 and entitled the member to three financial literacy courses; 2,000 shares of stock in Global Com InterNetworks, Inc. ("GCI"), Integrated Solutions International, Inc. ("ISI"), and Genex, Inc., three "infrastructure" companies that Dukes and Hodge purportedly were developing; and the opportunity to buy additional shares of stock in the companies at preferred prices before their initial public offerings (IPOs). The intermediate level, known as the "Warriors" level, required an initial payment of $1,050 and

4

entitled the member to two financial literacy courses, 500 shares of stock in each of the three companies, and the same opportunity to purchase more shares at preferred prices. The least expensive level, known as the "Believers" level, required an initial payment of $550 and entitled the member to one financial literacy course, 250 shares of stock in each of the three companies, and the opportunity to buy more shares at pre-IPO prices.

B.

Dukes and Hodge initially marketed FWC to smaller African-American Pentecostal churches. Their first church presentation was on September 27, 2000, at the Victorious Church of Jesus Christ in Camp Springs, Maryland. Dukes later hired Sam Hairston, the church's pastor, to assist with marketing FWC in the greater church community.[3]

Dukes and Hodge presented FWC at churches around six or seven more times before the end of 2000. At the beginning of 2001, Dukes took FWC on the road, giving presentations at numerous churches throughout Georgia, Michigan, Ohio, New York, New Jersey, and Alabama.

Aside from appealing to potential investors' religious feelings, Dukes and those who introduced him also told potential investors about his considerable investment experience, including

_____

[3]As a pastoral liaison, Hairston reached out to other clergy and church communities to generate interest in FWC and schedule presentations for Dukes and Hodge.

5

experience at a Wall Street brokerage firm. Dukes told investors that he had extensive experience taking companies public, the most notable of which was a retail clothing store called Today's Man. Dukes often noted in presentations that he had given financial advice to a church in Washington, D.C. and that, as a result, the church made $50,000 and two church members bought matching Porsche automobiles with their profits. To further assuage potential investors' concerns, both Dukes and Hodge told investors that they personally invested a large amount of money -- approximately $1,000,000 -- in FWC. They also offered a money-back guarantee on any investment in FWC up to the time of the infrastructure companies' IPOs.

FWC flyers and handouts explained to potential investors that the company was seeking 10,000 members. Dukes initially told potential investors that FWC would take GCI public sixty days after it had sold 5,000 FWC memberships, ISI public ninety days later, and Genex public ninety days after that. In later presentations, however, Dukes changed the projected timing of GCI's IPO.[4] Dukes also stated on multiple occasions that ISI was obtaining banking licenses with the assistance of a former Washington, D.C. banking commissioner, that ISI officials had talked to fifty top state

---

[4]For example, in October 2000, Dukes told potential investors that GCI would go public before the end of the year, but then, only a few weeks later during another presentation, he told another group of prospective FWC investors that GCI would go public in four to six months.

banking regulators, and that ISI would soon be operating a national African-American owned bank. Dukes and Hodge told FWC members that financial literacy courses would start within a few months of their investments.

C.

When it became apparent that FWC's promised benefits (financial literacy courses and IPO profits) were not forthcoming, a number of FWC members requested a refund of their investments. Only a handful of members actually received a refund. When Dukes failed to respond timely to some FWC members' complaints, some of those members contacted the Maryland Attorney General's office. On March 5, 2001, the Maryland Securities Commissioner issued a cease-and-desist order against Dukes and Hodge, ordering them to stop offering or selling unregistered securities, including memberships in FWC, and to stop violating the anti-fraud provision of the Maryland Securities Act, Md. Code Ann., Corps. & Ass'ns §§ 11-101 tp 11-805 (LexisNexis 2005).[5] Dukes was served with a copy of the order on March 7, 2001. On the same day, and after he had received notice of the order, Dukes presented FWC at a large church in Perth Amboy, New Jersey, collecting approximately $200,000 in membership fees. Dukes returned the membership applications and fees to FWC's office in Maryland.

---

[5]As of the date of the cease-and-desist order, FWC had fewer than 1,000 investors.

7

On March 13, 2001, Dukes incorporated a new FWC entity in Washington, D.C. Around the same time, Dukes moved FWC out of its Maryland office.

On April 10, 2002, Dukes and Hodge entered into a consent decree with the Maryland Securities Commission. Pursuant to the terms of the decree, Dukes admitted to the Commission's findings of fact. The decree also contained the Securities Commission's legal conclusions that Dukes and Hodge had committed securities and investment fraud under the Maryland Securities Act, which Dukes neither admitted nor denied. In the decree, the Commission also repeated its orders to Dukes and Hodge to cease and desist from engaging in fraudulent investment activities.[6]

D.

On December 22, 2003, a grand jury sitting in the District of Maryland returned a fifteen-count superseding indictment against Dukes and Hodge, charging them with mail fraud, illegally

---

[6]One of the Commission's legal conclusions was that Dukes and Hodge "made material misrepresentations or omissions in connection with the offer or sale of securities." (J.A. at 1917.) The Commission ordered that Dukes and Hodge "permanently cease and desist from misrepresentation or omission of material facts that would constitute fraud" and "permanently cease and desist from engaging in fraudulent investment advisory activities." (J.A. at 1917.)

8

transporting property obtained by fraud, and money laundering.[7] Dukes's trial began on May 24, 2005.[8]

On June 8, 2005, the jury found Dukes guilty on all counts. Over numerous objections by Dukes to the presentence report (PSR), the district court sentenced Dukes to 120 months' imprisonment, followed by 36 months' supervised release, and ordered Dukes to pay $1,173,518 in restitution. Dukes timely appealed his convictions and sentence. We have jurisdiction over this appeal pursuant to 28 U.S.C.A. § 1291 (West 2006) (providing for appellate jurisdiction over "final decisions" of the district court) and 18 U.S.C.A. § 3742(a) (West 2000) (providing for appellate jurisdiction over a "final sentence" entered by the district court).

II.

On appeal, Dukes raises a number of evidentiary challenges to his convictions. "We typically review for abuse of discretion a district court's evidentiary rulings." United States v. Perkins. 470 F.3d 150, 155 (4th Cir. 2006). If the challenging party failed to object below to admission of the evidence, however, we review only for plain error. United States v. Chin, 83 F.3d 83, 87 (4th Cir. 1996). We address each of Dukes's arguments in turn.

---

[7]On the Government's motion, the district court dismissed three of the counts against Dukes.

[8]The district court severed Hodge's trial.

## A.

Dukes's first argument focuses on the district court's admission of paragraph 14 of the consent decree between him and Hodge and the Maryland Securities Commission. The Government's theory at trial was that FWC was a vehicle for fraud from its inception and that Dukes never intended to offer financial literacy courses or take the three infrastructure companies public. Dukes's defense was that he never had an intent to defraud and acted in good faith. During its case-in-chief, the Government asked a witness who had invested in FWC whether Dukes had ever told him that "none of the three infrastructure companies has any prospect for going public." (J.A. at 748.) Dukes immediately objected to this question on the ground that there was no evidence that the companies had no chance of going public. In response, the Government sought to introduce paragraph 14 of the consent decree between Dukes and the Maryland Securities Commission. The paragraph states: "None of the three infrastructure companies has ever had any employees, contracts or revenues. None has any prospect for going public. Financial Warfare has no prospect for capturing 5% of the minority market." (J.A. at 1915.)

Dukes objected again, this time on the ground that Dukes's forward-looking statement in April 2002 was irrelevant to his earlier state of mind and improper to put before the jury. The Government informed the district court that Dukes had consented to the findings of fact in the decree. The court instructed the

Government that it could ask its question but also instructed the Government to refrain from referencing the Securities Commission's legal conclusions in the decree. Obviously reading from paragraph 14, the Government then asked the witness whether Dukes had ever told him that none of the three infrastructure companies has any prospects for going public, to which the witness replied, "No he did not." (J.A. a 752.)

Dukes argues that his April 2002 admission that the three infrastructure companies had no prospects of going public at that time is irrelevant to determining his state of mind about the companies' IPO prospects before issuance of the cease-and-desist order. He contends that admission of the paragraph was improper under Federal Rule of Evidence 403 because it likely misled or confused jurors into believing that his forward-looking statement in April 2002 reflected his belief about the companies' viability before he received notice of the cease-and-desist order. The parties argue over whether Dukes preserved this argument through objection at trial, but the record plainly shows that he did. Nevertheless, we conclude that the district court did not err in admitting the factual findings contained in paragraph 14 of the decree.

Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. Because Dukes "expressly consented," (J.A. at

11

758), to the findings of facts in paragraph 14, they constitute adoptive admissions under Federal Rule of Evidence 801(d)(2)(B), which classifies as "not hearsay" a "statement of which the party has manifested an adoption or belief in its truth."

These findings of fact were undoubtedly relevant to the Government's case against Dukes. Although the probative value of Dukes's admissions may be somewhat diminished by their timing, the only prejudice that flowed from their introduction at trial is the kind of prejudice inherent in all relevant evidence. See United States v. Williams, 445 F.3d 724, 730 (4th Cir. 2006) ("It is worth remembering that the touchstone for excluding evidence under Rule 403 is not prejudice, but 'unfair' prejudice." (internal quotation marks omitted)); United States v. Russell, 919 F.2d 795, 798 (1st Cir. 1990) ("Much of the Government's evidence in a criminal case is damaging to the defendant; that is why it is offered. Evidence should be precluded only where it is unfairly prejudicial."); 1 Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, Federal Rules of Evidence Manual 403-9 (9th ed. 2006) ("Evidence is not 'prejudicial' merely because it is harmful to the adversary. After all, if it didn't harm the adversary, it wouldn't be relevant in the first place."). Dukes's argument discounts the jury's ability to consider evidence in context and evaluate evidence based on all of its characteristics, including its timing. We reject Dukes's contention.

12

B.

Next, Dukes argues that the district court erred in allowing the Government to ask guilt-assuming hypothetical questions. Because Dukes objected at trial,[9] we review the district court's admission of this testimony for abuse of discretion. <u>United States v. Jackson</u>, 327 F.3d 273, 298 (4th Cir. 2003).

As noted above, once the district court overruled Dukes's objection to the Government's admission of the findings of fact contained in paragraph 14 of the consent decree, the Government asked a FWC investor the following questions:

> Government: "Did Mr. Dukes ever tell you . . . that none of the three infrastructure companies has any prospect for going public?"

> Witness: "No, he did not."

> Government: "And if he had told you that, would that have affected your decision to invest in Financial Warfare Club?"

> Witness: "Yes, it would have."

(J.A. at 752.)

Dukes contends that this line of questioning ran afoul of the well-settled rule prohibiting the use of guilt-assuming hypothetical questions. <u>See, e.g.</u>, <u>United States v. Siers</u>, 873

---

[9]Specifically, Dukes objected to the Government's questions on the grounds of their "irrelevance" and "impropriety." (J.A. at 751.) It is clear from the context that Dukes's objection was on the ground that the questions, being irrelevant, might mislead or confuse the jury.

13

F.2d 747, 749 (4th Cir. 1989) ("[P]utting to [the witness] a hypothetical fact situation corresponding to the crime for which [the defendant] was being tried, is error, and, again, we neither condone nor excuse the same."); United States v. Smith, 354 F.3d 390, 396 n.5 (5th Cir. 2003)("A common vice is for the examiner to couch a question so that it assumes as true matters to which the witness has not testified . . . . Whether the witness is friendly or hostile, the answer can be misleading." (internal quotations marks and alterations omitted)). Dukes's argument, however, misses the mark. The Government's first question -- "Did Mr. Dukes ever tell you . . . that none of the three infrastructure companies has any prospect for going public?" -- was not "hypothetical" at all. The Government was merely asking the witness for historical information, i.e., whether Dukes had ever expressed doubts to the witness about the infrastructure companies' financial futures.

The Government's follow-up question, which asked the witness whether his investment choice would have been different if Dukes had altogether discounted the infrastructure companies' IPO chances, was hypothetical, but the question did not assume Dukes's guilt of the charged crimes. Instead, it focused on the materiality of Dukes's representations about the infrastructure companies' financial prospects. In this regard, the question was qualitatively different than the guilt-assuming hypothetical questions proscribed by courts, which assume the defendant's guilt of the very crime(s) with which he is charged and most often are

14

asked during cross-examination on the heels of testimony about the defendant's good character or reputation. Cf. United States v. Mason, 993 F.2d 406, 409 (4th Cir. 1993)(in a drug distribution case, it was error for government to ask character witness on cross-examination whether his opinion of the defendant would change if he knew that the defendant had "distributed drugs"), United States v. Barta, 888 F.2d 1220, 1224 (8th Cir. 1989) (in tax evasion case, holding that it was error for district court to allow prosecutor to ask character witness if his opinion of the defendant "would change if, if the facts showed that he had, in fact, lied on his income tax return"); United States v. Williams, 738 F.2d 172, 177 (7th Cir. 1984) (in fraud case, holding it was error for Government to ask character witnesses on cross-examination if their opinions would change if they knew that the defendant had committed the charged fraud). Here, the Government did not ask the fact witness to assume that Dukes committed "fraud." Dukes's argument is therefore unavailing.

C.

Dukes also challenges the district court's admission of the entire consent decree into evidence. Although the Government introduced the consent decree into evidence only for the purpose of getting the findings of fact in paragraph 14 before the jury, the district court, for reasons unclear from the record, admitted the entire consent decree into evidence, despite its earlier instruction to the Government not to reference the Commission's

15

legal conclusions contained in the decree.  Later, during closing argument, the Government urged the jurors to review the consent decree during deliberations.  Specifically, the Government counseled the jury in the following way: "If you want to look at [the consent decree] back in the jury room, that's the exhibit number.  This is the one that [defense counsel] almost jumped out of his shoes when I first tried to read from it - you may recall that - a week or so ago."  (J.A. at 1619.)

Dukes's challenge to the admission of the consent decree in toto is a layered one.  He first contends that the district court erred under Federal Rule of Evidence 408 in admitting the entire decree because the decree was offered to prove Dukes's criminal liability.[10]  Alternatively, he argues that the consent decree was inadmissible under Rule 403 because it contained the Maryland Securities Commission's legal conclusions, neither admitted nor denied by Dukes.  He contends that the danger of unfair prejudice to Dukes substantially outweighed the consent decree's probative

---

[10]At the time of Dukes's trial, Rule 408 provided in pertinent part:

> Evidence of (1) furnishing or offering or promising to furnish,  or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

Fed. R. Evid. 408 (2005).

16

value because it contained an administrative body's conclusions of guilt and because it incorporated many of the accusatory statements from the cease-and-desist order, statements that the district court excluded precisely because of their danger of unfair prejudice to Dukes.

The Government responds that Rule 408 is inapposite here because the consent decree was not offered to prove Duke's liability under the Maryland securities laws, on which the decree focused. The Government also contends that we must review Dukes's challenge to the admission of the consent decree for plain error because Dukes failed to object at trial to its admission in toto.

We agree with the Government that plain error review is warranted because Dukes did not object below on Rule 403 or Rule 408 grounds. The Government introduced the consent decree into evidence as "Exhibit 2," without objection from Dukes, and began reading part of the decree into the record. After the Government had read nearly three full paragraphs of the decree into evidence, Dukes made the following objection: "Your Honor, in that document, aside from those specific findings of fact that my client expressly consented to, everything else in that document is the commissioner's hearsay that has no place before this jury." (J.A. at 758.) In response, the Government stated that it would "go right to the findings [of fact]," and the district court instructed the Government that it could read into evidence the findings of fact but not the Commission's legal conclusions. (J.A. at 758.)

17

Despite this instruction, the court allowed the entire decree to be published to the jury.

Federal Rule of Evidence 103 provides that an "[e]rror may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected and . . . a timely objection . . . appears of record, stating the specific ground for the objection, if the specific ground was not apparent from the context." Fed. R. Evid. 103(a)(1); see also United States v. Parodi, 703 F.2d 768, 783 (4th Cir. 1983) ("[T]he objecting party [must] object with that reasonable degree of specificity which would have adequately apprised the trial court of the true basis for his objection ....")(internal quotation marks omitted)). Here, Dukes did not object until after the district court had admitted the consent decree and permitted the Government to begin reading from it, and even then, Dukes's lone objection was that "everything in that document [besides the factual findings] is the commissioner's hearsay." (J.A. at 758.) At no point did Dukes object on the grounds that the decree was inadmissible under Rules 403 and 408. It is well-established that a specific objection made on one ground will not preserve appellate review of a different ground. See Exxon Corp. V. Amoco Oil Co., 875 F.2d 1085, 1090 (4th Cir. 1989)(citing Wright & Miller for the rule that "a party may not state one ground for objection and attempt to rely on a different ground for appeal"); Udemba v. Nicoli, 237 F.3d 8, 14-15 (1st Cir. 2001)("It is a bedrock rule that a party who

18

unsuccessfully objects to the introduction of evidence on one ground cannot switch horses in midstream and raise an entirely new ground of objection on appeal without forfeiting the usual standard of review."); 1 Saltzburg, et. al., Federal Rules of Evidence Manual 103-18 ("It is axiomatic that a specific objection made on one ground will not preserve an objection to the same evidence on different grounds."); United States v. Wilson, 966 F.2d 243, 246 (7th Cir. 1992)(holding that an objection on relevance grounds did not preserve objection that evidence is unduly prejudicial under Rule 403). Because Dukes did not object below on Rule 408 or Rule 403 grounds, plain error review is in order.

Under plain error review, Dukes must show that (1) the district court committed an error; (2) the error was plain; and (3) the error affected his substantial rights, i.e., that the error affected the outcome of his trial. United States v. Olano, 507 U.S. 725, 732-34 (1993); United States v. Hughes, 401 F.3d. 540, 547-48 (4th Cir. 2005). If Dukes makes this showing, we should only notice the error if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Hughes, 401 F.3d at 555 (internal quotation marks and citation omitted).

Even if we assume that the district court plainly erred under Rule 403 in admitting the entire consent decree, however, Dukes has not shown that the error affected the outcome of his trial. Evidence at trial showed that many of Dukes's representations about

19

his investment experience, FWC, and the three infrastructure companies were false. A number of FWC investors testified that they invested in FWC because of Dukes's representations about his investment and IPO experience, particularly his experience taking Today's Man public. The Government introduced, without objection, Dukes's sworn testimony before the Securities and Exchange Commission (SEC) in which he admitted that he did not help any of his Wall Street clients with IPOs and did not participate "in any form or fashion" in taking Today's Man public. (J.A. at 771). Contrary to what he had told investors, Dukes also testified before the SEC that the former Washington, D.C. banking commissioner he mentioned in presentations was not actively working with Dukes to develop ISI, that ISI officials had not spoken to fifty state banking regulators, and that ISI had not taken any steps toward securing a banking license.[11]

The Government also elicited testimony that contradicted Dukes's claim that his investment advice had resulted in substantial profits for a Washington, D.C. church and two of its members. James E. Jordan, Jr., a long-time pastor of the church, testified that he had never heard of Dukes, Hodge, or FWC before being contacted by the U.S. Attorney's Office about the case and

---

[11]At trial, Dukes implicitly blamed divine inspiration for his "misstatement" about ISI. After acknowledging that ISI had not taken any of the steps that he claimed, Dukes defended, "Again, to understand, this is ministry. So as you get inspired, that may be a misstatement on my part . . . ." (J.A. at 371.)

20

that the church had not invested in the stock market at all during the time period in question.

The Government introduced extensive testimony describing FWC's "money trail" that contradicted Dukes's claim that he had invested much of his own money in FWC. Kevin DeLacey, a staff accountant in the SEC's enforcement division, testified that there was no evidence that Dukes and Hodge had made large cash investments in FWC amounting to anywhere near $1 million, although FWC financial records showed that between July 2000 and October 2001 Dukes and Hodge collected in excess of $1.3 million from FWC investors.[12] During that same period, Dukes received $136,805 in salary from FWC and a related entity; paid $4,295.93 in expenses with FWC funds; and withdrew around $85,917 from FWC accounts. Dukes and Hodge spent in excess of $121,000 on travel expenses during the same period.

Given the cumulative evidence of Dukes's misrepresentations to potential FWC investors and members, and taking into account any error in the admission of the consent decree, we conclude that Dukes has not shown how admission of the consent decree affected

---

[12]In fact, Dukes's testimony before the Maryland Securities Commission, the SEC, and at trial produced three different amounts for his personal investment in FWC. Acknowledging that he had told investors that he and Hodge had invested approximately $1,000,000 to $1,500,000 of their own money in FWC, Dukes testified at trial that he had personally invested $600,000 to $700,000; testified before the Maryland Securities Commission that he had invested $100,000 of his own money; and testified before the SEC that he had invested only $75,000 of his own money.

his substantial rights because we are assured "that the judgment was not substantially swayed by [any possible] error." Kotteakos v. United States, 328 U.S. 750, 765 (1946).

D.

Dukes's final evidentiary challenge relates to the district court's admission of financial summary charts that were used by the Government at trial. Several weeks prior to trial, the Government advised Dukes that it planned to call DeLacey, an SEC accountant, as a fact witness to present summary charts of FWC's bank records. On April 26, 2005, at a pretrial hearing, Dukes requested that the summary charts be made available to him immediately. On April 28, 2005, the district court ordered that "any summary charts, together with the enumeration of the documents upon which they were based, must be disclosed to the Defendants no later than May 10, 2005." (J.A. at 60.) The Government made the summary charts available to Dukes on May 19, 2005, nine days after it was supposed to have provided them to Dukes and only five days before trial. Dukes raised the issue of the Government's untimely production to the district court, but the court overruled his objection.

Two weeks into the trial, Dukes discovered that the Government had failed to make exhibit GX4 available to him before trial. The exhibit was a more detailed version of exhibit GX3, which was provided to Dukes before trial. Instead of excluding exhibit GX4, the district court advised Dukes's counsel that he could take extra time to review the exhibit before its admission.

22

Dukes argues that the district court erred under Federal Rule of Evidence 1006 in admitting the summary charts because the Government did not provide the charts to Dukes until five days before trial, and, in the case of summary chart GX4, until after the trial had begun. The Government responds that Rule 1006 only requires that the documents underlying the summary charts, and not the summary charts themselves, be "made available" to the opposing party at a reasonable time and place. Dukes concedes that the Government made the underlying documents available at a reasonable time and place.

Rule 1006 provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

Fed. R. Evid. 1006.

The plain language of the rule favors the Government. It requires only that the summarized documents, and not the summaries themselves, be made available to the opposing party at a "reasonable time and place." In United States v. Foley, 598 F.2d 1323 (4th Cir. 1979), the defendant argued that the trial court should have excluded the Government's summary exhibits because, although the Government made the underlying documents available to the defendant well before the trial, the Government provided the charts themselves

23

to the defendant the weekend before the trial.  Id. at 1338. Focusing on the plain language of Rule 1006, we rejected the defendant's argument, stating that Rule 1006 "refers to making available the original documents, not the charts themselves." Id.; see also Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co., 412 F.3d 745, 753 (7th Cir. 2005)("[Rule 1006] does not say when the summaries must be made available to the party – for that matter, it nowhere states that the summaries must be made available to the opposing party.").

Dukes correctly points out, however, that "no federal rule is needed . . . to empower a district judge to prevent a party from springing summaries of thousands of documents on the opposing party so late in the day that the party can't check their accuracy against the summarized documents before trial." Fid. Nat'l, 412 F.3d at 753.  Indeed, one prominent treatise has noted that Rule 1006's purpose is thwarted if the summaries themselves are not provided to the opposing party at a reasonable time "because, without notice of the summaries' contents, adverse parties cannot know what to look for in the source material to determine if the summaries are accurate."  31 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 8045, at 549 (2000); see also United States v. Janati, 374 F.3d 263, 273 (4th Cir. 2004)("The obvious import of [Rule 1006] is to afford a process to test the accuracy of the chart's summarization.").  Nevertheless, our review of the record reveals that the district court was keenly aware of the importance

24

of preserving Dukes's ability to have meaningful cross-examination of the Government's summary witnesses about the exhibits and that Dukes's ability to do so was preserved. For example, with respect to summary exhibit GX4, the exhibit provided to Dukes after his trial had begun, the district court carefully considered the possibility of prejudice to Dukes by its late production and ensured that Dukes had ample time to review the exhibit before cross-examination, even requiring the Government to introduce the exhibit out of sequence so that the court and Dukes would have more time to review it. (See, e.g., J.A. at 1074 (regarding summary exhibit GX4: "[I]f he needs additional time to review it, then I can give him that. I don't want to necessarily keep [the exhibit] out, but I want to make certain that Mr. Stiller [Dukes's counsel] is armed and dangerous when the time comes to cross examine with enough knowledge of [the exhibit].").) Given the district court's sensitivity to preserving Dukes's opportunity to cross-examine rigorously the Government's witness about the summary charts, we cannot say that the district court abused its discretion in admitting the charts, particularly in light of our having sanctioned similar practice on very similar facts in Foley.

III.

Dukes also raises a number of challenges to the district court's application of the Guidelines during sentencing. "In assessing a challenge to a sentencing court's application of the Guidelines, we review the court's factual findings for clear error and its legal conclusions de novo." United States v. Allen, 446 F.3d 522, 527 (4th Cir. 2006).

A.

We begin with Dukes's challenge to the district court's application of Guideline § 2F1.1(b)(6)(a), which provides for a two-level enhancement to a defendant's offense level if "the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials." U.S. Sentencing Guidelines Manual § 2F1.1(b)(6)(A) (2000).

Dukes first argues that application of the "relocation" enhancement to his sentence resulted in impermissible double-counting because the conduct justifying application of the enhancement -- Dukes's relocation and reincorporation of FWC outside of Maryland to circumvent the Maryland Securities Commission cease-and-desist order -- was already taken into account by the district court in its application of Guideline § 2F1.1(b)(4)(C), the enhancement for "violation of any prior, specific judicial or administrative order, injunction, decree, or process nor address

26

elsewhere in the guidelines," U.S. Sentencing Guidelines Manual § 2F1.1(b)(4)(C) (2000).  In support of his argument, Dukes points to the commentary to § 2F1.1(b)(4)(C), which states that "[t]his enhancement does not apply if the same conduct resulted in an enhancement pursuant to a provision found elsewhere in the guidelines."  U.S. Sentencing Guidelines Manual § 2F1.1(b)(4)(C) cmt. n.6 (2000).

Dukes's double-counting argument fails, as it is clear that the district court relied on different conduct in applying the respective enhancements.  In applying § 2F1.1(b)(4)(C), the district court relied on Dukes's March 7, 2001 presentation of FWC to a group of potential investors in New Jersey and his request for the presentation materials (which still listed Maryland as FWC's mailing address) to be sent to Maryland, after he learned the same day of the Commission's cease-and-desist order, which ordered Dukes and Hodge to cease and desist from offering, presenting, or otherwise promoting FWC memberships "in or from" Maryland.  In applying the § 2F1.1(b)(6)(A) enhancement, the court relied on Dukes's re-incorporation of FWC in Washington D.C. and his movement of FWC's offices to Washington, D.C.  Dukes's double-counting argument is thus without merit.

Alternatively, Dukes contends that the district court erred in applying § 2F1.1(b)(6)(A) because (1) FWC was still doing business in Maryland at the same time that the court deemed Dukes to have

27

relocated FWC to Washington, D.C. and (2) Dukes did not conceal his relocation of FWC. This argument also fails.

First, Dukes concedes that he and Hodge physically moved FWC's offices to Washington D.C. and re-incorporated FWC there after being served with the cease-and-desist order in Maryland. That FWC continued limited operations in Maryland while Dukes and Hodge both legally and physically moved the locus of the enterprise to another jurisdiction does not render the enhancement inapplicable. Guideline § 2F1.1(b)(6)(A) applies "[i]f the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials," id., and we cannot say that the district court erred in finding that Dukes had relocated the scheme to Washington, D.C.

Second, with respect to Dukes's argument that § 2F1.1(b)(6)(A) is inapplicable if the defendant did not conceal his relocation activity, there is no language in § 2F1.1(b)(6)(A) that supports such a "concealment" requirement. Although evidence that Dukes concealed his identity or activities would no doubt be relevant to a showing that the relocation was for the purpose of evading the Maryland Securities Commission's cease-and-desist order, § 2F1.1(b)(6)(A) contains no requirement of concealment, other than the relocation itself. See United States v. Paredes, 461 F.3d 1190, 1193 (10th Cir. 2006)(interpreting Guideline § 2B1.1(b)((A), the amended version of § 2F1.1(b)(6)(A), and holding that the enhancement "contains no requirement of concealment, other than the

28

relocation itself"). The district court therefore did not err in applying § 2F1.1(b)(6)(A) to Dukes's sentence because Dukes's relocation of FWC was enough by itself to evidence evasion of the Maryland Securities Commission.

## B.

Dukes also argues that the district court erred in enhancing his sentence pursuant to § 3B1.3 for abusing a "position of trust." Guideline § 3B1.3 calls for a two-level increase to a defendant's offense level if "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S. Sentencing Guidelines Manual § 3B1.3 (2000).

"Determining what constitutes a position of trust for the purposes of § 3B1.3 is not a simple task," United States v. Caplinger, 339 F.3d 226, 236 (4th Cir. 2003)(internal quotation marks and alteration omitted), because the "enhancement was not designed to turn on formalistic definitions of job type," United States v. Gordon, 61 F.3d 263, 269 (4th Cir. 1995). "[F]raud alone does not justify the enhancement," United States v. Bollin, 264 F.3d 391, 415 (4th Cir. 2001), nor does a "mere showing that the victim had confidence in the defendant," Caplinger, 339 F.3d at 237 (internal quotation marks omitted). "Something more akin to a fiduciary function is required." Id. (internal quotation marks omitted). "Overall, the question of whether a defendant held a

29

position of trust must be approached from the perspective of the victim." Gordon, 61 F.3d at 269. And "[b]ecause the [position of trust] inquiry requires a 'sophisticated factual determination,' a trial court's finding will be reversed only if clearly erroneous." Id.

In applying the § 3B1.3 enhancement to Dukes's sentence, the district court largely focused on Dukes's marketing of FWC in the church community. In fact, the court stated that Dukes "wouldn't be where he is today if he hadn't gone near a church where trust was placed in him." (J.A. at 1870.) Dukes, however, contends that the religious context of many of his presentations did not "automatically elevate his relationship with the investors to that of a position of trust." (Appellant's Br. at 53.)

If the district court had applied the "abuse of trust" enhancement based solely on the religious context of Dukes's fraud, then we would have little trouble concluding that the court erred. The court did not, however, focus only on the religious context of Dukes's fraud but also noted that investors had placed trust in Dukes partly because of "his representations about his skills," (J.A. at 1870), including noting that Dukes had highlighted for investors his Wall Street experience and his alleged experience taking Today's Man public. In fact, the court specifically referenced Application Note 2(A) to § 3B1.3, which states that the enhancement applies to a defendant who "perpetrates a financial fraud by leading an investor to believe the defendant is a

legitimate investment broker." U.S. Sentencing Guidelines Manual § 3B1.3 cmt. n.2 (2000). As noted earlier, a number of FWC investors testified that they invested in FWC because of Dukes's investment experience, and one investor in particular testified that his investment decision was greatly influenced by Dukes's representation that he was a "legitimate stockbroker." (J.A. at 319.)

Given its attention to Dukes's representations about his investment experience, we cannot say that the district court clearly erred in its application of § 3B1.3 to Dukes's sentence. From the perspective of the FWC investor, Dukes's representations about his time on Wall Street, his experience taking companies public, and his previous clients' investment successes would have been key components in the overall decision to invest and created "[s]omething more akin to a fiduciary duty" owing from Dukes to the FWC investors. Caplinger, 339 F.3d at 237. (J.A. at 319.) We therefore reject Dukes's argument.

C.

Finally, Dukes argues that the district court erred in enhancing his sentence pursuant to Guideline § 3B1.1(c), the enhancement for "aggravating role," because the court erroneously concluded that § 3B1.1(c) does not require that the defendant organize, lead, manage, or supervise at least one other participant in the crime. The Government responds that under § 3B1.1(c) a

31

defendant need not organize, lead, manage, or supervise another participant so long as the defendant exercises significant management responsibility over the criminal organization's property and assets. Alternatively, the Government argues that even if the enhancement does require management of at least one other criminal participant, the district court found that Dukes had exercised such leadership over Hodge.

Dukes has the better of the argument. Guideline § 3B1.1(c) provides for a two-level increase if "the defendant was an organizer, leader, manager, or supervisor in any criminal activity." U.S. Sentencing Guidelines Manual § 3B1.1(c) (2000). Application Note 2 to § 3B1.1 makes clear that

> [t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of <u>one or more other participants</u>. An upward departure may be warranted, however, in the case if a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

U.S. Sentencing Guidelines Manual § 3B1.1 cmt. n.2 (emphasis added). "Participant" is defined as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." <u>Id.</u> cmt n.1. There is a clear distinction between an <u>adjustment</u> under § 3B1.1, which requires that a defendant have been the organizer, leader, manager, or supervisor of one or more other participants, and an upward <u>departure</u> under § 3B1.1, which can be based solely on the defendant's exercise of "management

32

responsibility over the property, assets, or activities of a criminal organization." Thus, the plain language of the commentary makes clear that for <u>enhancement purposes</u> the defendant must have organized, led, managed, or supervised at least one other criminal participant. <u>See</u> <u>United States v. Sayles</u>, 296 F.3d 219, 226 (4th Cir. 2002) (stating that § 3B1.1(c) only applies when the defendant was an "organizer, leader, manager or supervisor of <u>people</u>" (emphasis in original)); <u>United States v. Capers</u>, 61 F.3d 1100, 1109 (4th Cir. 1995)(noting the same).

Contrary to the Government's contention, the district court did not base its application of the enhancement on Dukes's control of Hodge. Instead, the court applied § 3B1.1(c) because it concluded that the enhancement does not require that the defendant control another criminal participant. The district court reasoned as follows:

> 3B1.1(a) talks about an organizer or leader of an activity involving five or more participants. And [3B1.1(c)] simply comes back to being an organizer, leader, manager or supervisor in any criminal activity and does not use the term participant at all. It is clear that Mr. Dukes was an organizer of the vehicle that used to carry out these crimes, the Financial Warfare Club, and I, therefore, conclude that this aggravating role adjustment is appropriate.

(J.A. at 1868-69.)

The court's legal conclusion that the enhancement under § 3B1.1(c) does not require control of at least one other participant in the crime is clearly erroneous in light of the commentary to § 3B1.1 and

33

our decisions in <u>Sayles</u> and <u>Capers</u>.  We therefore remand to the district court for resentencing.[13]

IV.

In sum, we affirm Dukes's convictions, but we remand this case to the district court for resentencing because the court erred in its application of the "aggravating role" enhancement.

<u>AFFIRMED IN PART,</u>
<u>VACATED IN PART,</u>
<u>AND REMANDED</u>

---

[13]Of course, on remand, the district court is free to enhance Dukes's sentence under § 3B1.1(c) if the court finds that Dukes organized, led, managed, or supervised at least one other criminal participant.  We express no opinion on this issue.

HAMILTON, Senior Circuit Judge, dissenting:

By far, the most critical and hotly contested issue at Dukes' trial was whether Dukes intended that the Financial Warfare Club constitute a scheme to defraud investors of their money or whether he actually believed that the Financial Warfare Club presented them with a legitimate investment opportunity. Yet, the jury was erroneously permitted to read the Conclusions of Law portion of the "CONSENT ORDER"[1], (J.A. 1911), which portion set forth the Securities Commissioner of Maryland's conclusion that, with respect to Dukes' activities in promoting the Financial Warfare Club, Dukes "made material misrepresentations or omissions in connection with the offer or sale of securities in Maryland and in dealing with investment advisory clients, in violation of Sections 11-301 and 11-302 of the [Maryland Securities] Act." (J.A. 1917). The jury was also erroneously permitted to consider the Injunction portion of the Consent Order, which portion ordered Dukes to "permanently cease and desist from misrepresentation or omission of material facts or other activities that would constitute fraud in connection with the offer or sale of securities in violation of Section 11-301 of the Act; and . . . permanently cease and desist from engaging in fraudulent investment advisory activities with respect to the offer and sale

_____

[1]The majority opinion refers to this document as the consent decree. I will refer to it as "the Consent Order."

35

of securities in violation of Section 11-302 of the Act . . . ." (J.A. 1917).[2]

All of this information undoubtedly left the jury with the impression that a high-ranking Maryland official, with likely far more expertise in the field of securities than any individual juror in the case, had already found Dukes guilty of the same fraudulent activities for which the government sought to convict Dukes in his federal criminal trial. That any probative value of such information was substantially outweighed by the danger of unfair prejudice is obvious. It is human nature to rely upon the opinion of one exceedingly more knowledgeable than us in a given field. It is also human nature to rely upon an opinion carrying the imprimatur of an entire state. With all measure of certainty, these two circumstances combined to create the inevitable danger that the jury would rely upon the Commissioner's conclusion that Dukes committed fraud in promoting the Financial Warfare Club and her related fraud-terminology-laden orders to cease and desist to find Dukes guilty of mail fraud in connection with his activities in promoting the Financial Warfare Club. The mail fraud counts also supplied predicate offenses for the counts charging Dukes with interstate transportation of property obtained by fraud and money laundering.

---

[2]I will explain later why I believe Dukes sufficiently objected to the admission of the Conclusions of Law and Injunction portions of the Consent Order to have preserved the issue for nonplain-error review.

Under these circumstances, the Conclusions of Law and the Injunction portions of the Consent Order should have been excluded from the jury's consideration pursuant to Federal Rule of Evidence 403 (Rule 403), Fed. R. Evid. 403.[3]  Because I cannot say with fair assurance that, without stripping the erroneous admission of the Conclusions of Law and Injunction portions of the Consent Order from the whole, the jury's verdict was not substantially swayed by the error, United States v. Curbelo, 343 F.3d 273, 286 (4th Cir. 2003), I would vacate Dukes' convictions and sentence and remand for a new trial.  Accordingly, I dissent.

I.

Before delving further into the actual merits of Dukes' challenge to the admission of the Conclusions of Law and Injunction portions of the Consent Order as violative of Rule 403, I will address the majority's erroneous holding that our review of such challenge is limited to the plain-error standard of review set forth in United States v. Olano, 507 U.S. 725 (1993).  To preserve an evidentiary challenge for appellate review under the most appellant-friendly standard of review, Federal Rule of Evidence 103(a)(1) requires "a timely objection or motion to strike . . . stating the

_____

[3]Rule 403 provides:  "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.

specific ground of the objection, <u>if the specific ground was not apparent from the context</u>." (emphasis added). Referring to this last clause, in <u>Werner v. Upjohn Co.</u>, 628 F.2d 848 (4th Cir. 1980), we explained that Rule 103(a)(1) "requires specific objection only where the specific ground would not be clear from the context." <u>Id.</u> at 853. We went on to hold that the specific ground requirement did not apply in that case because, although the defendant had only made a general objection to the admission of the challenged item of evidence at trial, the defendant had filed a pretrial motion with supporting memoranda asking that all references to the challenged item of evidence be suppressed. <u>Id.</u> at 853. Based upon this situation, we held: "From our examination of the record, we have no doubt that the ground for objection was clear to everyone." <u>Id.</u>

Here: (1) Dukes timely objected to the admission of the Consent Order with the exception of the Findings of Fact portion (to which he had stipulated); and (2) the ground for his objection was apparent from the context. With respect to the timely objection requirement, at the time the government sought to admit the entirety of the Consent Order and began reading from it, Dukes offered the following objection after receiving the district court's permission to approach for a bench conference: "Your Honor, in that document, aside from those specific findings of fact that my client expressly consented to, everything else in that document is the commissioner's hearsay that has no place before this jury." (J.A. 758). The government immediately responded: "We'll go right to the findings.

38

We can go right to the findings, Your Honor. I was just sort of laying the foundation so the jury understands where we're reading from." Id. The district court then told the government: "Tell them--read them what you did at the bench that admit to these findings of fact, but they are conclusions of law, if you want to read in specific, not the whole thing."[4] Id. The government responded: "No, we're not going to read the whole thing." (J.A. 758-59). The district court concluded: "All right." (J.A. 759).

With respect to the specific ground for his objection being apparent from the context, the record shows that prior to Dukes' just quoted objection at trial, Dukes had made and the district court had granted a motion in limine with respect to the Summary Order to Cease and Desist (the Cease and Desist Order) issued by the Securities Commissioner of Maryland. Such order preceded the Consent Order and alleged that, with respect to his activities in promoting the Financial Warfare Club, Dukes violated sections 11-301 and 11-302 of the Maryland Securities Act. Additionally, akin to the Consent Order, the Cease and Desist Order ordered Dukes to "cease and desist from engaging in material misrepresentations or

---

[4]In the earlier bench conference referenced by the district court, Dukes objected to the admission of any allegations contained in the Consent Order and made clear that he believed the only admissible portion of the Consent Order was the Findings of Fact portion. At the same bench conference, the government acknowledged that Dukes did not agree to the legal conclusions contained in the Consent Order. At the conclusion of this earlier bench conference, the district court told Dukes and the government that it intended "to tell the jury there's no objection to the facts contained in the" Consent Order. (J.A. 750-51).

39

omissions in connection with the offer or sale of securities in [Maryland], pending a hearing in this matter or until such time as this Order is modified or rescinded by the Securities Commissioner," (page 12 of the Cease and Desist Order), and to "cease and desist from engaging in material misrepresentations or omissions in connection with the offer of investment advice in [Maryland], pending a hearing in this matter or until such time as this Order is modified or rescinded by the Securities Commissioner," (page 13 of the Cease and Desist Order). In his motion in limine, Dukes expressly argued, inter alia, that the "never-proven allegations set forth in the Cease and Desist Order are of no probative value but are extremely prejudicial to Mr. Dukes." In support of this argument, Dukes cited Rule 403.

In initially addressing Dukes' motion in limine, the district court stated:

> This is a motion from Mr. Dukes in limine to preclude the government from introducing as an exhibit the summary order to cease and desist issued by the Securities Commissioner of Maryland. I looked at this one, and it seems to me -- at least without having the benefit of hearing what the government's position is -- that this is an accusatory order that does not amount to an adjudication, with some pretty powerfully prejudicial stuff in it, and it seems to me that the position that [Dukes] is taking that he does not dispute the actual order entered[.]"

(J.A. 92) (emphasis added). Following a response by the government that it expected to call one witness to testify that he delivered the Cease and Desist Order to Dukes, the district court stated:

40

[Dukes] has, in effect, proposed a stipulation to you that the State of Maryland Securities Commissioner did in fact, on or about March 5, 2001, ordered Mr. Dukes to cease and desist the activities, which I assume are described in the order in more detail, but that he continued to do so in violation of the order.

It seems to me that cleans up all the questions of <u>the pretty powerful allegations in this order that are</u> <u>not the result of any adjudicated proceeding but, rather,</u> <u>solely accusatory.</u>

Would that not solve the problem?

(J.A. 93) (emphasis added).

The government responded: "Your Honor, I think the only issue would be the question of whether or not we would have to refresh a witness' recollection of what they did in terms of . . . ." <u>Id.</u> The district court interrupted: "You mean somebody from the Maryland Securities Commission?" <u>Id.</u> The government answered:

There actually will be an investigator from the Maryland Securities Commission who actually served this on Mr. Dukes at the time. It's simply a matter there -- as I said, we don't intend to introduce the actual allegations itself but simply there will be references to the fact that this was served on Dukes, and that despite the fact that it was served on him that they continued on their merry way to present this to individuals in other states and continued to use the same mailing address in Maryland.

I think it will probably come up -- I may be just hedging a little bit. In terms of this witness' recollections of things, he may actually remember a lot more than what I'm proposing, and it was simply out of an abundance of caution.

(J.A. 93-94).

41

The district court concluded:

> What I will do is this. I'm going to grant his motion with respect to the actual document that's attached to his exhibit, but that's without prejudice to your right to make inquiry of a witness as to the existence of a cease and desist order, and it would not preclude you from showing this document to the witness to refresh their recollection of the witness if the witness can't remember that a cease and desist order was entered, but that by referring to that exhibit during an examination of the witness I will make that an exception to the rule that once it's been referred to it's in evidence. <u>It will not be in evidence. I won't permit this, because I think it's far too accusatory in nature.</u>
>
> So, that will be my ruling on this motion.

(J.A. 94) (emphasis added).

When Dukes' motion <u>in limine</u> with respect to the Cease and Desist Order is considered in context with the colloquy between the district court and the parties on such motion and the two bench conferences concerning the Consent Order, there can be no reasonable doubt that when Dukes objected to the admission of the entire Consent Order minus the stipulated Findings of Fact portion, the ground for his objection was violation of Rule 403. As with the case of the defendant in <u>Werner</u>, from a full examination of the record, there is no doubt that "the ground for objection was clear to everyone." <u>Id.</u> at 853. Accordingly, Dukes preserved his right to have his evidentiary challenge to the Conclusions of Law and the Injunction portions of the Consent Order reviewed under the most appellant-friendly standard of review.

42

II.

Having concluded that the admission of the Conclusions of Law and the Injunction portions of the Consent Order violated Rule 403, the relevant question becomes one of harmless error under Federal Rule of Criminal Procedure 52(a), with the government bearing the burden of proving harmlessness. United States v. White, 405 F.3d 208, 223 (4th Cir. 2005) (government bears burden of proof in proving harmless error under Federal Rule of Criminal Procedure 52(a)). In United States v. Curbelo, 343 F.3d 273 (4th Cir. 2003), we gave the following helpful elucidation of Rule 52(a)'s harmless error standard:

> In its landmark decision in Kotteakos, the Supreme Court explained that when reviewing a nonconstitutional error under Rule 52(a), an appellate court must determine if the Government has proved "with fair assurance . . . that the judgment was not substantially swayed by the error." 328 U.S. at 765, 66 S. Ct. 1239. Moreover, in determining if the Government has met this burden, a court must not "strip [ ] the erroneous action from the whole." Id. Thus, [t]he inquiry cannot be merely whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand. Id. The Court later explained that "grave doubt" meant "that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." O'Neal v. McAninch, 513 U.S. 432, 435, 115 S. Ct. 992, 130 L. Ed. 2d 947 (1995).

Id. at 286.

To reiterate, I cannot say with fair assurance that, without stripping the erroneous admission of the Conclusions of Law and

43

Injunction portions of the Consent Order from the whole, the jury's verdict was not substantially swayed by the error. The error went to the very heart of the government's case against Dukes. In order to convict Dukes on the mail fraud counts, the government bore the burden of proving beyond a reasonable doubt that Dukes "acted with the specific intent to defraud" the Financial Warfare Club investors.[5] United States v. Goodwin, 272 F.3d 659, 666 (4th Cir. 2001). Even Dukes' convictions on the remaining counts were all predicated upon Dukes being convicted of mail fraud. See 18 U.S.C. §§ 1957, 2314.

Among other witnesses and documentary evidence, the government presented the testimony of eighteen investor witnesses at trial. Dukes never disputed the accuracy of the government's evidence at trial. For example, Dukes did not dispute that he had told potential investors information that was untrue. The crux of Dukes' defense at trial was a good faith defense. Specifically, Dukes

---

[5]The mail fraud statute, 18 U.S.C. § 1341, provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, . . . shall be fined under this title or imprisoned not more than 20 years, or both.

Id.

claimed that he always intended for the Financial Warfare Club to deliver on his promises to investors, but that circumstances beyond his control doomed the project. The circumstances allegedly beyond his control were in the form of growth of the project too fast for he and his business partner Teresa Hodge to conduct presentations and meet member demands and the legal problems created by the Cease and Desist Order. One of the overarching emotional themes of Dukes' defense was that he was black, and as a black man, he created the Financial Warfare Club to provide his fellow black community access to the fruits of the stock market, which blacks had traditionally been denied. According to Dukes, the Financial Warfare Club was the product of his hopeful vision not a scheme to defraud. Dukes also admits that there were times that he, in the enthusiasm of the moment and due to his passion for the cause, exaggerated information he told potential investors.

To be sure, the jury heard compelling evidence that Dukes knowingly misrepresented his credentials to potential investors in the Financial Warfare Club and significantly improved his lifestyle (i.e., enjoying fancy dinners and plush hotel rooms) via the money he received from Financial Warfare Club investors. The jury also heard evidence of the complete lack of financial success of the Financial Warfare Club and Dukes' failure to provide investors with any financial education seminars as he promised. But, nonetheless, all of this evidence was only circumstantial evidence of Dukes' intent to defraud Financial Warfare Club investors of their money.

45

The Conclusions of Law and Injunction portions of the Consent Order arguably fall into the direct evidence category on the critical issue of Dukes' intent, which would naturally be more compelling to the jury than the circumstantial evidence.  For example, the jury could have easily viewed the Consent Order as a quasi-judicial order which had already found Dukes guilty of fraud based upon the same underlying conduct as that charged in the federal criminal indictment.  The temptation for the jury to return a verdict of guilty in the face of such an item of evidence would have been overwhelming.

The critical flaw in the majority opinion's analysis of the merits question is that it never squarely addresses the actual impact, one way or the other, of the jury's ability to consider the Conclusions of Law and Injunction portions of the Consent Order. Rather, it merely highlights the circumstantial evidence before the jury tending to show that Dukes acted with the specific intent to defraud the Financial Warfare Club investors and then, in conclusory fashion, states:  "Given the cumulative evidence of Dukes's misrepresentations to potential FWC investors and members, and taking into account any error in admission of the consent decree, we conclude that Dukes has not shown how admission of the consent decree affected his substantial rights because we are assured 'that the judgment was not substantially swayed by [any possible] error.'" Ante at 20-21 (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)).

Notably, the government does not even attempt to argue that admission of the Conclusions of Law and Injunction portions of the Consent Order passed Rule 403 balancing in favor of admission. Rather, the government's line of defense is to stress that it only focused on the Findings of Fact portion of the Consent Order at trial.

This line of defense is a nonstarter for the government, because the undisputed record shows that the jury, nonetheless, had the opportunity to read, at the repeated urging of the government during closing arguments, the entire Consent Order during deliberations. There is simply no way around the fact that the jury was urged to consider a powerfully prejudicial item of evidence that went to the most critical and hotly contested issue in the case. This is just one of those cases where no matter how persuasive the other evidence of fraudulent intent was, the erroneously admitted evidence was so compelling in favor of finding that Dukes acted with fraudulent intent no reasonable person could say with fair assurance that the jury here was not substantially swayed by such erroneously admitted evidence.

## III.

To conclude: (1) Dukes sufficiently complied with Rule 103 to avoid plain-error review; (2) the Conclusions of Law and Injunction portions of the Consent Order violated Rule 403's balancing test;

47

(3) under the applicable standard of review the government bore the burden of proving the error was harmless; and (4) the government did not carry its burden of proving the error was harmless. Accordingly, I would vacate the criminal judgment in this case and remand the case for a new trial. I would not reach any other assignment of error by Dukes.